IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:12-CT-3103-FL

| | | |
|---|---|---|
| JEREMY PAYLOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| ROBERT C. LEWIS, LARRY DUNSTON, FRANK L. PERRY, W. DAVID GUICE, and GEORGE SOLOMON,[1] | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

This matter comes before the court on the parties' cross-motions for summary judgment (DE 65, 71). The issues raised have been fully briefed and are ripe for adjudication. For the following reasons, the court grants defendants' motion for summary judgment and denies plaintiff's motion for summary judgment.

## STATEMENT OF THE CASE

Plaintiff, a former state inmate, filed this civil rights action *pro se* pursuant to 42 U.S.C. § 1983 on May 9, 2012. The court subsequently allowed plaintiff to proceed and entered an order of investigation directing North Carolina Prisoner Legal Services ("NCPLS") to investigate plaintiff's action and to notify the court whether it would represent plaintiff. On March 6, 2013, NCPLS notified the court that it would provide plaintiff representation.

---

[1] The court notes that, pursuant to Federal Rule of Civil Procedure 25(d), defendant Frank L. Perry was substituted for former defendant Reuben F. Young and defendant W. David Guice was substituted for former defendant Jennie Lancaster. Defendant George Solomon was substituted for plaintiff's official capacity claim against defendant Robert C. Lewis. Lewis remains a defendant as to plaintiff's official capacity claims against him.

On April 4, 2013, NCPLS filed an amended complaint alleging two claims pursuant to the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Plaintiff first asserted that he was subjected to an indefinite detention in solitary confinement as a result of the policies and procedures set forth and enforced by defendants Frank L. Perry ("Perry"), W. David Guice ("Guice"), Robert C. Lewis ("Lewis"), Larry Dunston ("Dunston"), and George Solomon ("Solomon"). Plaintiff, additionally, contended that the conditions in solitary confinement were atypical and significant in relation to the ordinary incidents of prison life. Finally, plaintiff alleged a claim pursuant to the Eighth Amendment to the United States Constitution arising out of his prison conditions. As relief, plaintiff sought declaratory and injunctive relief against all defendants and compensatory and punitive damages against defendants Dunston and Lewis.

On April 16, 2013, defendants filed a motion to dismiss, arguing that plaintiff failed to state a claim upon which relief may be granted. The court denied defendants' motion on February 25, 2014. The court then entered a case management order setting deadlines for the filing of amended pleadings, conducting discovery, and the filing of dispositive motions. On January 15, 2015, the court signed a joint protective order, filed by defendants, governing the production of documents in the discovery process.

On June 8, 2015, plaintiff filed a motion requesting permission to enter Bertie Correctional Institution ("Bertie") for the purpose of inspecting, measuring, and photographing the units. The court granted plaintiff's motion. Then, on August 28, 2015, the court entered a text order directing the parties to identify a private mediator or to submit proposed dates for a court-hosted settlement conference. In response, the parties agreed to court-hosted mediation.[2] The court thereafter referred

---

[2] The court notes that defendants requested that the mediation take place after the resolution of dispositive motions.

the matter to United States Magistrate Judge James E. Gates for the scheduling and performance of a court-hosted settlement conference. The magistrate judge held the settlement conference on October 7, 2015, but the parties did not reach a resolution of the case.

On November 10, 2015, plaintiff filed a motion for summary judgment, arguing that he is entitled to judgment as a matter of law. Plaintiff attached to his motion a personal declaration, photographs of Bertie, photographs of Polk Correctional Institution ("Polk"), North Carolina Department of Public Safety's ("DPS") High Security Maximum Control Policy and Procedure, DPS's Standard Operating Procedures for the High Security Maximum Control ("HCON") unit,[3] custody classification notices received by plaintiff, and the expert report of James E. Aiken. Aiken offered the following opinion:

A.    There is no penological validation that would justify or necessitate avoiding more precise and factual information being given to Mr. Paylor regarding his placement in a highly restrictive and secure environment when compared to his previous security placement and housing.

B.    Mr. Paylor could have received more due process which would not endanger the overall safety and security of inmates, staff, community and the operation of the agency and institution.

C.    The housing in H-Con is more secured, intensive and restrictive when compared to his previous security status and housing prior to January 20, 2012.

D.    When there are deficiencies in establishing empirical facts and more due process, Mr. Paylor's high security restriction in H-Con raises, operationally, to the level of a Constitutional violation.

---

[3] HCON is "the isolation of close custody felon inmates that pose, or continue to pose, an imminent threat to the life or health of other inmates or staff or the isolation of inmates that otherwise pose a serious threat to the security and integrity of a prison facility." DPS Policies and Procedures, Chpt. C, § .1701(a).

3

E.    Mr. Paylor's restricted access to outdoor recreation is not
justified based on his behavior and compliant history even in
a high-security setting such as H-Con.

(Aiken Report. p. 6.)

Defendants then filed a cross-motion for summary judgment, arguing that plaintiff is unable

to establish a constitutional violation.  Alternatively, defendants assert the affirmative defense of

qualified immunity.   Defendants attached to their motion affidavits from Bertie Assistant

Superintendent Demetrius Clark ("Clark"), DPS Correctional Classification Coordinator Lane Partin

("Partin"), Polk's Assistant Superintendent for Operations Irvin Ryan ("Ryan"), DPS Risk

Manager/Standards Director for Health Services Stephanie Leach ("Leach").   Defendants also

attached to their motion incident reports, supporting investigative materials, DPS Policies and

Procedures governing the inmate security classification process, plaintiff's "Offender's Control

Action" narrative, portions of plaintiff's medical records, an April 29, 2014, memorandum to

Michael T. Munns regarding "Atrium Recreation Program for HCON Inmates," and the HCON

canteen order form.  The motions were fully briefed.

## STATEMENT OF FACTS

Except as where otherwise noted below, the undisputed facts are as follows.  This action

arises out of plaintiff's placement on High Security Maximum Control following a series of gang-

related incidents at Bertie on January 20, 2012.  (Clark Aff. ¶¶ 7-16.)  Generally, DPS custody

classification decisions are reviewed through a four step process.  (Partin Aff. ¶ 7; DPS Policies and

Procedures, Chpt. C, §§ .0102(a), .0104.)  First, the classification coordinator, or other appropriate

staff, refers an inmate for HCON placement.  (Partin Aff. ¶ 7; DPS Policies and Procedures, Chpt.

C, §§ .0102(a), .1703(a).)  The referral "should contain details of the incident that makes [HCON]

4

placement necessary including the time and place of such incidents and the names of the sources of information relied upon by the referring authority." (DPS Policies and Procedures, Chpt. C, § .1703(b).) DPS policy also requires that each HCON referral include a mental health and medical evaluation. (Id., § .1701(b)(3), (4).)

After an HCON recommendation is made, it is forwarded to the Facility Classification Committee ("FCC").[4] (Partin Aff. ¶¶ 10-12, 15; DPS Policies and Procedures, Chpt. C, § .0104(b).) The inmate then is given at least 48 hours notice of a FCC hearing regarding his reclassification. (Partin Aff. ¶ 15.) After the hearing, the FCC makes a determination as to the inmate's custody classification and notifies the inmate of the outcome of its decision. (Partin Aff. ¶ 15; DPS Policies and Procedures, Chpt. C, § .0104(b).) Then, the FCC decision is sent to the Divisional Classification Committee ("DCC").[5] (Partin Aff. ¶ 12, 16.) The inmate again is given at least 48 hours notice of the DCC hearing regarding his reclassification. (Partin Aff. ¶ 16; DPS Policies and Procedures, Chpt. C, § .1702(a)(1).) FCC hearings generally are in person, whereas DCC hearings are held with the inmate through video conference. (Partin Aff. ¶¶ 15, 16.) After the DCC hearing, "the inmate involved should receive a written summary of the facts upon which the committee relied in making its determination." (Partin Aff. ¶ 18; DPS Policies and Procedures, Chpt. C, § .1702(a)(4).) If the recommendations from the FCC and DCC levels conflict, the Director of Classification Services ("DCC") resolves the conflict and makes an assignment decision. (Partin Aff. ¶ 18.) Following an

---

[4] The FCC is comprised of high-ranking officers within the inmate's facility and a member of programs or case management staff. (Partin Aff. ¶ 11); DPS Policies and Procedures, Chpt. C, § .0104(b).

[5] The DCC "represents the Director of Prisons as the highest Division classification committee. The Director of Prisons . . . shall designate HCON DCC members from Superintendent IV's, III's, and II's, Wardens, Deputy Wardens, Correctional Administrators, Assistant Superintendent II's or comparable staff." DPS Policies and Procedures, Chpt. C, § .0104(a)(3).

inmate's reclassification to HCON, the inmate's custody classification is reviewed at six month

intervals. (DPS Policies and Procedures, Chpt. C, § .0102(c)(1).) The court now turns to the facts

regarding plaintiff's custody classification history as they relate to this action.

Prior to the January 20, 2012, incidents, plaintiff was a regular population inmate at Bertie.

(Pl.'s Aff. ¶ 5.) As an inmate in regular population at Bertie, plaintiff had a job as a hallway janitor

earning .75¢ per day, and received gain time credit on his sentence. (Id. ¶ 7.) Plaintiff also had the

ability to move about the housing unit for most of the day, as well as access to the day room where

he could watch television, play cards, make telephone calls, visit other inmates, play ping pong, and

lift weights. (Id. ¶¶ 5-12.) Plaintiff additionally had access to an indoor gym, outdoor recreation

yard, the chow hall, and the canteen. (Id.) In regular population, plaintiff had the ability to attend

religious services and the ability to sit with his mother in the same room for visitation. (Id. ¶¶ 10,

11; Ex. 3, pp. 3-2; 3-10.)

On January 20, 2012, there were a series of gang-related inmate-on-inmate attacks within

approximately five DPS correctional facilities, two of which occurred at Bertie. (Clark Aff. ¶¶ 7-16;

Ryan Aff. ¶ 5.) During the second attack at Bertie, Clark, the officer in charge at that time,

attempted to stop an inmate Travis Walters ("Walters") from stabbing another inmate, Deandre

Nelson ("Nelson"). (Clark Aff. ¶ 11.) Clark repeatedly ordered Walters to surrender his weapon,

but Walters refused. (Id.) At one point, Walters told Clark that Clark would have to kill him in

order to get the weapon. (Id.) Plaintiff, who stood witness to the incident, then ordered Walters to

surrender the weapon, and Walters complied. (Id. ¶ 12.) Aside from ordering Walters to surrender

his weapon, plaintiff was not otherwise directly involved with the altercation between Walters and

6

Nelson. (Pl.'s Aff. ¶ 20.) However, two additional inmates, Brian Murphy and Jensen Paylor, were involved with the incident. (Clark Aff. ¶ 13.)

On January 24, 2012, plaintiff was transferred to administrative segregation at Bertie while the January 20, 2012, incidents were being investigated. (Pl.'s Aff. ¶ 21.) While on administrative segregation, a Lieutenant Biggs visited plaintiff and assured him that once the investigation was complete, plaintiff would be released from administrative segregation. (Id.) After both a DPS internal investigation and a Federal Bureau of Investigation external investigation, Bertie prison officials determined that plaintiff was a high-ranking member of the "Pretty Tony" sect of the United Blood Nation ("UBN") gang with knowledge of the January 20, 2012, incidents. (Clark Aff. ¶ 20.)

The investigation revealed that the "Pretty Tony" sect ordered its members to target other sects of the "UBN" gang as part of on-going conflict within "UBN" over the division of the "Pretty Tony" and the "G-Shine" sects. (Id.) The investigation further revealed that the assaults were planned, and that the inmates designated with carrying out the assaults were instructed by gang leadership to not involve or harm Bertie staff during the incidents. (Id.) Plaintiff was not charged with a disciplinary offense related to the Bertie incidents. (Pl.'s Aff. ¶ 20; Clark Aff. ¶ 18.) According to Clark, plaintiff was not charged with a disciplinary offense because "his involvement with the incident was only later determined to be the result of gang leadership and because he had not physically taken part in the attacks."[6]  (Clark Aff. ¶ 18.)

On February 6, 2012, Bertie prison officials sent plaintiff a notice recommending that he remain on administrative segregation for an additional 45 days "pending investigation." (Pl.'s Aff.

---

[6]  After the investigation, inmates Walters, Nelson, Brian Murphy, and Jensen Paylor pleaded guilty to disciplinary charges related to the January 20, 2012, attacks at Bertie. (Clark Aff. ¶ 17.) These inmates then were reclassified to HCON and transferred to Polk. (Id.)

¶ 22; Ex. 7-1.) Two days later plaintiff received a "Notice of Action Taken by Classification Authority" stating that DPS agreed with the recommended 45 days of continued administrative segregation pending an investigation. (Id. ¶ 23; Ex. 7-2.)

On February 28, 2012, plaintiff received a notice from the Facilities Classification Committee ("FCC") recommending "possible HCON housing." (Pl.'s Mem. Ex. 7-3; Partin Aff. Ex. B, pp. 1-2.) Plaintiff's case manager entered the following control comments:

> Inmate . . . is being referred for placement on high security maximum control. . . . He is a level 1 United Blood Nation Member he has a prior control history dated 6-4-09-11-7-09 following infractions for gang involvement (A-14), extortion (A-21) and barter/trading (C-9). I/m Paylor and another inmate were involved in strong arming and intimidating inmates by a show of force to join the UBN or pay to stay on the yard. He has received 8 infractions since readmission with the latest on 2-21-11 for threaten to harass (B-18) and disobey order (C-3). Inmate Paylor has been identified at the divisional level as a leader within his respective gang community recently, his gang leadership created uprising within numerous close custody facilities which resulted in a lo[n]g term lockdown period in some of the largest close custody facilities in the state[.] Therefore, to ensure the proper security is maintained within our general populations and to limit this leader's communication with his "Foot Soldiers," high security maximum control is being recommended.

(Partin Aff. ¶ 21; Ex. B, pp. 1-2.) Plaintiff's unit manager agreed with the case manager's recommendation, and forwarded the recommendation to Bertie's FCC. (Id.) The FCC and the facility superintendent (or his designee) agreed with the HCON placement recommendation. (Id.) Plaintiff received written notice of the HCON recommendation on March 6, 2012. (Pl.'s Mem. Ex. 7-4.) The FCC's HCON recommendation then was forwarded to the DCC, and plaintiff was provided notice of a DCC hearing to be held on March 13, 2012. (Partin Aff. ¶ 21; Ex. B, p. 2; Pl.'s Mem. Ex. 7-5.)

8

On March 13, 2012, plaintiff attended his DCC hearing through video conference. (Partin Aff. ¶ 22; Ex. B, p. 2.) In the course of the hearing, plaintiff informed the committee that he had not been convicted of any disciplinary infractions related to the January 20, 2012, incidents, and denied any involvement. (Id.) The DCC, in turn, informed plaintiff that he had been identified as a gang leader and that he posed a risk to facility security that required his placement on HCON to minimize that risk.[7] (Id.) A DCC member also told plaintiff that his HCON referral recommendation was based on what she "had heard about him." (Pl.'s Aff. ¶ 27.) After the hearing, the DCC recommended that plaintiff be placed on HCON for 180 days. (Partin Aff. ¶ 22; Ex. B, p. 2.) Plaintiff was provided written notice of the DCC decision, and then transferred to the HCON unit at Polk. (Pl.'s Mem. Ex. 7-6.)

While on HCON at Polk, plaintiff was confined to an approximately 80 square foot cell for at least 23 hours per day. (Pl.'s Aff. ¶ 30.) Plaintiff's security classification also subjected him to additional security restrictions.[8] (Ryan Aff. ¶ 12.) For instance, HCON inmates are permitted only limited access to the telephone, which consists of the ability to call their attorney of record. (Id. ¶ 14.) Plaintiff, additionally, was permitted visitation with his immediate family twice per month. (Id. ¶ 15.) HCON inmates are not permitted to attend programing outside of their cells, but

---

[7] Plaintiff admits that he previously associated as a member in the UBN, but states that he disavowed himself of all ties to the organization in 2010. (Pl.'s Aff. ¶ 16.) There is no indication that plaintiff took steps to formally renounce his gang membership with DPS. (Ryan Aff. ¶ 10.) In light of plaintiff's UBN affiliation, DPS validated plaintiff as a member of a Security Threat Group ("STG"). (Pl.'s Aff. ¶ 17.) In January 2012, plaintiff had a STG designation of 1 on a scale of 1 to 3. (Id.) Following the January 2012 incidents, plaintiff's STG level was raised to 3. (Id.)

[8] Plaintiff's cell consisted of a concrete bed frame, a combination sink and toilet, a desk with a fixed concrete stool, a shower, and one window. (Pl's Ex. B, ¶ 30.)

9

do have access to a portable library, pastoral counseling as needed or requested,[9] and an in-cell anger management course. (Id. ¶ 16.) Plaintiff also did not experience the same level of contact with fellow inmates or staff that he experienced at Bertie. (Pl's Aff. ¶ 35.) The parties dispute whether plaintiff had canteen privileges while on HCON. (Pl.'s Aff. ¶ 35; Id. ¶ 20.)

Regarding recreation, plaintiff received indoor recreation five days per week, for one hour at a time, in a 100 square foot cell adjacent to his own. (Pl.'s Aff. ¶ 34; Pl.'s Mem. Ex.s 4-5, 4-6; Ryan Aff. ¶ 17.) The parties agree that plaintiff did not receive outdoor recreation while on HCON, but dispute whether an outdoor recreation opportunity in an atrium area[10] was available during that time period. (Pl.'s Aff. ¶ 31; Pl.'s Mem. Ex. 4-2; Ryan Aff. ¶ 18.) The parties, however, do not dispute the atrium was not used for recreation when plaintiff was housed on HCON. (Id.) Rather, it was not until 2014 that prison officials implemented the "Atrium Recreation Program." (Ryan Aff. ¶ 18.)

Plaintiff's HCON custody classification was not permanent. Rather, plaintiff's custody classification was regularly reviewed by Polk's case management staff, the FCC and the DCC. For instance, on July 3, 2012, plaintiff's program supervisor reviewed plaintiff's custody classification and recommended that plaintiff remain on HCON for an additional 180 days due to the "serious nature of the referring incidents" and "the need for further observation." (Partin Aff. Ex. B, p. 5.) On July 16, 2012, plaintiff was notified of his DCC hearing on August 7, 2012. (Pl.'s Mem. Ex. 7-7.) The FCC also recommended that plaintiff be continued on HCON for an additional 180 days due to "security concerns," and plaintiff was notified of the FCC's recommendation. (Partin Aff. Ex.

---

[9] Plaintiff admits that he occasionally met with a chaplain while he was on HCON. (Pl.'s Aff. ¶ 35.)

[10] The atrium area does not appear to be an outdoor area, but appears to have larger windows than the indoor recreation area used for plaintiff. See (Pl.'s Ex. 4-4; 4-6.)

B, p. 5; Pl.'s Mem. Ex. 7-8.)  On August 14, 2012, The DCC conducted a video conference regarding plaintiff's HCON recommendation on August 14, 2012, which plaintiff did not attend. (Partin Aff. Ex. B, p. 5; Pl.'s Aff. ¶ 38.)  The DCC recommended that plaintiff remain on HCON for an additional 180 days "based upon the serious nature of the referring incident."  (Partin Aff. Ex. B, p. 5.)

On October 17, 2012, plaintiff was notified that Polk's case management staff recommended that plaintiff remain on HCON for an additional 180 days, and that a FCC hearing was scheduled for October 22, 2012.  (Pl.'s Aff. ¶ 39; Ex. 7-9.)  Plaintiff did not attend the FCC hearing, and on October 22, 2012, plaintiff was notified that the FCC agreed with his continuation on HCON.  (Pl.'s Aff. ¶ 40; Ex. 7-11.)  On that same day, plaintiff also was notified that a DCC "control review" hearing was set for November 27, 2012.  (Pl.'s Aff. ¶ 40; Ex. 7-10.)  Plaintiff did not attend the November 27, 2012, DCC hearing.  (Partin Aff. Ex. B, p. 8.)  At the DCC hearing, the committee noted that plaintiff had not received an infraction while on HCON, but recommended that plaintiff remain on HCON for an additional 180 days due to the serious nature of the referring incident.  (Id.)

Following a custody classification review on March 21, 2013, Polk case management staff recommended that plaintiff be promoted to maximum control ("MCON").  (Partin Aff. ¶ 27; Ex. B, p. 11.)  Plaintiff subsequently was notified of and attended the March 25, 2013, FCC hearing.  (Id.)  The FCC and Assistant Superintendent then recommended plaintiff for promotion to MCON.  (Id.)  Plaintiff next attended the April 9, 2013, DCC hearing.  (Id. ¶ 28; Ex. B, p. 11)  In the course of his DCC hearing, plaintiff stated that he "will live and die by the red flag no matter what control he is on."  (Id.)  Plaintiff further stated that "he had been treated unjustly and was in a war."  (Id.)  Based

upon plaintiff's comments, the DCC disagreed with the FCC and recommended that plaintiff remain on HCON for an additional 180 days. (Id.)

On August 19, 2013, Polk's case management staff recommended plaintiff for continuation on HCON. (Id. p. 14.) The Assistant Superintendent disagreed with the case management staff's recommendation, and recommended plaintiff for promotion to MCON. (Id.) The Assistant Superintendent noted that plaintiff "made no secret that he would like to remain on HCON because his mother is able to visit him, which has deterred him from getting into trouble." (Id.) Plaintiff attended the DCC hearing. (Id.) In response to questions regarding plaintiff's earlier DCC hearing comments regarding the red flag, plaintiff stated that he was misunderstood in that his comments referred to his Muslim faith, not a gang. (Id. p. 15.) Plaintiff also told the DCC that he was at war with the oppressive ways of the world. (Id.) However, when asked by the DCC if he could comply with DPS rules if promoted, plaintiff replied no. (Id.) Based upon plaintiff's comments, the DCC recommended that plaintiff remain on HCON for an additional 180 days. (Id.) In light of the conflicting recommendations of the Assistant Superintendent and the DCC, the Director of Classification Services, Marshall Pike, reviewed plaintiff's records. (Id.) Marshall Pike determined that plaintiff could be managed effectively on MCON, and plaintiff was promoted to MCON on September 23, 2013. (Id.)

While on MCON, plaintiff experienced similar conditions to those on HCON with some improvements. (Pl.'s Aff. ¶ 42.) For instance, on MCON, plaintiff had access to outdoor recreation five times per week, weather and staffing permitting. (Id.) Plaintiff, additionally, was permitted recreation inside the housing area, as well as contact with other individuals. (Id.) Plaintiff, however, still did not have regular access to the telephone, religious services, or educational

activities. (Id.) Plaintiff was transferred to Marion Correctional Institution on October 3, 2013. (Pl.'s Aff.¶ 33.)

Once promoted to MCON, the custody classification review procedures changed in that the FCC's recommendation was reviewed by the Director's Classification Authority ("DCA") rather than the DCC. (Partin Aff. ¶ 32.) On January 21, 2014, the FCC recommended that plaintiff be promoted to intensive control ("ICON"). (Id. Ex. B, p. 17.) Plaintiff then attended his January 23, 2014, DCC hearing. (Id.) At the hearing, plaintiff denied involvement in the January 20, 2012, incidents and indicated that he was "wrongfully accused." (Partin Aff. ¶ 32.) The DCA found plaintiff's prior statement that "he is in a war and not willing to comply with []DPS regulations" noteworthy and recommended that plaintiff remain on MCON for 180 days. (Id.; Ex. B.)

On June 3, 2014, case management staff again reviewed plaintiff's custody classification and recommended continuation on MCON due to gang-related disciplinary infractions which plaintiff received in April 2014. (Id. ¶ 33 and Ex. B, p. 19.) Specifically, plaintiff was found in possession of gang related materials and contraband. (Id.) Plaintiff was continued on MCON for an additional 180 days. (Id.)

Ultimately, plaintiff, was promoted to ICON on October 31, 2014. (Pl.'s Aff.¶ 43.) Plaintiff states that he experienced similar conditions to those on HCON, and "did not see any type of improvement in [his] conditions until [he] got on Modified Housing."[11] (Id.) Plaintiff thereafter was promoted to regular population in July 2015. (Id. ¶ 44.) Each notice plaintiff received from custody classification staff consisted of a simple short statement notifying plaintiff of the decision of each level of review, and did not contain factual support for the recommendation or decision.

---

[11] Plaintiff does not state what date he was promoted to modified housing. Rather, plaintiff confines his claims to his incarceration at Polk from March 19, 2012, through August 3, 2013. (Pl.'s Mem. p. 1, 15; Pl.'s Aff. ¶ 41.)

13

(Partin Aff. Ex. B; Pl.'s Ex. 7.)  Plaintiff was released from incarceration on February 23, 2016.  <u>See</u> www.doc.state.nc.us.

Given that plaintiff alleged that his condition at Polk affected his physical and mental health, the court now briefly sets forth the facts related to his medical condition while at Polk.  On October 24, 2012, plaintiff complained about hip pain, which he attributed to a prior gunshot injury.  (Leach Aff. ¶ 22; Ex. A, BS2179.)  Plaintiff later complained of back and elbow pain.  (<u>Id.</u> ¶¶ 10, 11, 18, 19, 20, 21; Ex A., BS2007-2009; BS2043-2044; BS2046; BS2047.)  In response, Polk medical staff conducted electromagnetic radiation ("x-ray") testing on plaintiff's elbow on February 8, 2013, and his back on March 22, 2013.  (<u>Id.</u> ¶¶ 10, 11; Ex. A, BS2007-2009)  The x-ray results indicated no abnormality with respect to plaintiff's back or elbow.  (<u>Id.</u>)

On March 26, 2014, plaintiff submitted a sick call request complaining of pain in his hip, pain in his buttocks, and headaches.  (<u>Id.</u> ¶ 14; Ex. A BS2036.)  During his medical evaluation by nursing staff, plaintiff again referenced his prior gunshot injury and attributed his nerve issues to that injury.  (<u>Id.</u>)  Plaintiff also complained about pain from his sciatic nerve and possible hernia throughout May and June 2012.  (<u>Id.</u> ¶ 31; Ex. A, BS2183-2188, 2191.)

In addition to the medical treatment he received for his physical injuries, plaintiff was seen by mental health staff on February 29, 2012, and April 19, 2012.  (<u>Id.</u> ¶¶ 24, 25.)  At his February 29, 2012, appointment, plaintiff was seen by a staff psychologist for an evaluation to determine whether he was suitable for placement on HCON status.  (<u>Id.</u> ¶ 24; Ex. A, BS2086.)  Plaintiff refused to attend the appointment and was evaluated in his cell.  (<u>Id.</u>; Ex. A, BS2133-2134.)  During his evaluation, plaintiff was uncooperative, loud, and cursed at the psychologist from the inside his cell.

(Id.; Ex. A, BS2134.)  The psychologist found no mental health conditions and no contradictions that would prevent plaintiff from placement on HCON status.  (Id. Ex. A, 2133.)

On April 19, 2012, plaintiff attended an appointment with a Polk psychologist after submitting a letter stating that he "needed to ask some questions."  (Id. ¶ 25; BS2126.)  Upon meeting with plaintiff, the psychologist noted that plaintiff appeared to have a sad expression and that plaintiff vaguely complained of "depression" but could not identify any symptoms.  (Id.) Plaintiff questioned the psychologist about why he was on HCON and the psychologist told him to speak with custody staff.  (Id.)  Plaintiff was given tips to improve his sleep habits and was scheduled for a follow-up and further evaluation.  (Id.)  The results of plaintiff's mental health evaluation indicated that mental health staff suspected him of malingering.  (Id. ¶ 26; Ex. A, BS 2132.)

On May 24, 2012, plaintiff attended a follow-up appointment with a Polk psychiatrist. (Id.¶ 27; Ex. A, BS2128-2129.)   The psychiatrist concluded that plaintiff was not suffering from depression and was not in need of medication.  (Id.)

## DISCUSSION

A.      Standard of Review

Summary judgment is appropriate when, after reviewing the record as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at

248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007). "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011).

B.     Analysis

Defendants raise the affirmative defense of qualified immunity. Government officials are entitled to qualified immunity from civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, a government official is entitled to qualified immunity when (1) the plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

1.     Injunctive Relief

Plaintiff was released from custody on February 23, 2016. See www.doc.state.nc.us. Federal courts may only decide actual cases or controversies. See U.S. Const. art. III, § 2. A "case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack, 395 U.S. 486, 496 (1969). "The requisite personal interest that

must exist at the commencement of the litigation ... must continue throughout its existence." <u>United States Parole Comm'n v. Geraghty</u>, 445 U.S. 388, 397 (1980) (quotation omitted). To satisfy the Article III case or controversy requirement, "[a] litigant must have suffered some actual injury that can be redressed by a favorable judicial decision." <u>Iron Arrow Honor Soc'y v. Heckler</u>, 464 U.S. 67, 70–71 (1983). When a case or controversy ceases to exist, the litigation becomes moot and the federal court no longer possesses jurisdiction to proceed. <u>Id.</u>

Here, plaintiff requests injunctive relief in the form of a court order directing defendants to return him to regular population and to enjoin defendants from subjecting inmates to indefinite incarceration on solitary confinement. (Am. Compl. p. 18. ¶¶ 3, 4.) Because plaintiff has been released from incarceration, his requests for injunctive relief in this case are DISMISSED AS MOOT. <u>See</u> <u>Incumaa v. Ozmint</u>, 507 F.3d 281, 287 (4th Cir. 2007).

  2.  Eighth Amendment Conditions of Confinement Claim

Plaintiff asserts that his prison conditions at Polk from March 19, 2012, through October 3, 2013, violated the Eighth Amendment. (Pl.'s Mem. p. 1, 15; Pl.'s Aff. ¶¶ 29, 41; Partin Aff. Ex B.) Under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, and medical care . . . ." <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994). The Eighth Amendment, however, "does not mandate comfortable prisons." <u>Rhodes v. Chapman</u>, 452 U.S. 337, 349 (1981); <u>see also</u> <u>Shakka v. Smith</u>, 71 F.3d 162, 166 (4th Cir. 1995) (internal citation omitted) ("[T]he ordinary discomfort accompanying prison life is part and parcel of the punishment those individuals convicted of criminal offenses endure as recompense for their criminal activity. Accordingly, only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim."). To succeed on an Eighth Amendment claim, an inmate must "show both (1) a serious

17

deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (internal quotation marks omitted).

Under the first prong, a prisoner must establish that the prison condition was a "sufficiently serious" deprivation of a basic human need. Farmer, 511 U.S. at 825. However, not every injury suffered by a prisoner "translates into constitutional liability for prison officials." Id., 511 U.S. at 834. Rather, "[o]nly extreme deprivations are adequate to satisfy" this objective component. De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003). In order to establish such an extreme deprivation, an inmate must show "a serious or significant physical or emotional injury resulting from the challenged conditions or demonstrate a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions." Odom v. S.C. Dep't of Corr., 349 F.3d 765, 770 (4th Cir. 2003) (internal quotation marks omitted).

The second prong involves a subjective analysis requiring plaintiff to establish that a defendant had a "sufficiently culpable" state of mind. Strickler, 989 F.2d at 1381. The Supreme Court has defined this state of mind requirement to mean deliberate indifference. Wilson v. Seiter, 501 U.S. 294, 303-304 (1991). "Deliberate indifference entails something more than mere negligence, . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." See Farmer, 511 U.S. at 835. It requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm. Id. at 837; Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995). The Fourth Circuit has adopted a "totality of the circumstances test," for reviewing Eighth Amendment claims. Mitchell v. Rice, 954 F.2d 187, 191 (4th Cir. 1992).

18

Plaintiff complains that his transfer to HCON resulted in the loss of his prison job, gymnasium privileges, human contact, outdoor recreation, canteen privileges, and television privileges. (Pl.'s Aff. ¶¶ 7, 32, 34, 35.) Plaintiff also complains that his indoor recreation time was substantially reduced and that his telephone privileges were strictly limited. (Id. ¶¶ 34, 35.)

The conditions plaintiff experienced at Polk are not unlike the conditions experienced by any inmate housed in solitary confinement. Wilkinson v. Austin, 545 U.S. 209, 211 (2005) ("For an inmate placed in OSP, almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room. Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities."). Additionally, plaintiff, does not have a constitutional right to many of the complained of conditions. For instance, inmates do not have a constitutional right to a prison job. See Altizer v. Paderick, 569 F.2d 812, 813 (4th Cir. 1978) ("[W]ork assignments of prisoners . . . are matters of prison administration, within the discretion of prison administrators," and do not implicate the due process clause.).

Plaintiff, likewise, does not have a constitutional right to canteen, television, education programs, vocational programs, or unlimited telephone privileges. See Moody v. Daggett, 429 U.S. 78, 88 n. 9 (1976) (finding that inmates do not have a constitutional right to access educational or rehabilitative programs); U.S. v. Alkire, No. 95-7885, 1996 WL 166400, at *1 (4th Cir. Apr.10, 1996) (finding no constitutional right to the use of a telephone in prison); Beck v. Lynaugh, 842 F.2d 759, 762 (5th Cir. 1988) (state has no constitutional obligation to provide basic educational or vocational training programs to prisoners) (citation omitted); Murphy v. Walker, 51 F.3d 714, 718

n. 8 (7th Cir. 1995) (finding "no support in the case law" for claim that denial of television amounts to constitutional violation); see also Pevia v. Shearin, No. ELH-14-2928, 2015 WL 9311970, at * 15 (D. Md. Dec. 22, 2015) ("The temporary loss of privileges such as visitation, phone use, commissary, and recreation are not so egregious as to shock the conscience."); Bennett v. Cannon, C/A No. 2:05–2634–GR, 2006 WL 2345983, at *2 (D.S.C. Aug.10, 2006) ("[t]here is simply no freestanding constitutional right to canteen privileges at all"). Finally, plaintiff does not have a constitutional right to visitation. See White v. Keller, 438 F. Supp. 110, 115 (D. Md. 1977), aff'd, 588 F.2d 913 (4th Cir. 1978). That said, the record reflects that plaintiff was in fact permitted visitation with his mother while on HCON. (Pl.'s Aff. ¶ 35.)

The court now considers plaintiff's recreation opportunities at Polk. The Fourth Circuit has recognized that withholding all exercise opportunities from a prisoner over an extended period of time violates the Eighth Amendment's prohibition on cruel and unusual punishment. See Mitchell, 954 F.2d at 191–92; see also Sweet v. S.C. Dep't of Corrs ., 529 F.2d 854, 865–66 (4th Cir. 1975) (two one-hour exercise periods per week may amount to cruel and unusual punishment when extended over a period of years of confinement). The court in Mitchell further recognized that penological necessities may justify exercise restrictions in some circumstances. See Mitchell, 954 F.2d at 192; Patterson v. Mitzes, 717 F.2d 284, 289 (6th Cir. 1983). Claims concerning opportunities to exercise are evaluated by using a totality of the circumstances analysis, which includes "the overall duration of incarceration, the length of time for which prisoners are locked in their cells each day, ... and the practical opportunity for the institution to provide prisoners with increased exercise opportunities." Id. at 191.

20

Here, plaintiff was not permitted outdoor exercise while on HCON, but was permitted one hour of out-of-cell exercise five days per week in a cell adjacent to his own. (Pl.'s Aff. ¶ 34.) Plaintiff was placed on these restrictions after prison officials determined he had a role in the January 20, 2012, incident and participated in gang-related activity while on HCON. (Partin Aff. ¶ 20; Ex. B., pp. 2, 11, 14, 15, 19.) Ryan attests that the HCON exercise policy is necessary to promote institutional safety and is the only effective means to manage inmates, such as plaintiff, who have demonstrated gang leadership roles. (Ryan Aff. ¶¶ 12, 22.) Although plaintiff's expert states that plaintiff's "restricted access to outdoor recreation is not justified based on his behavior and compliant history," there is no question that Bertie prison officials, in this case, were faced with serious and significant security risks and the court must afford officials deference in handling such issues. See (Aiken Report p. 5; Partin Aff. Ex. B); Florence v. Board of Chosen Freeholders of County of Burlington, __U.S.__, 132 S.Ct. 1510, 1515 (2012) (stating that "[t]he difficulties of operating a detention center must not be underestimated by the courts," and that "correctional officials . . . must have substantial discretion to devise reasonable solutions to the problems they face"). Finally, the exercise restrictions were not permanent. (Partin Aff. Ex. B.)

Based upon a totality of the circumstances, plaintiff is unable to establish a violation of the Eighth Amendment because the temporary exercise restrictions placed on HCON inmates at Polk are necessary to preserve the safety of the staff and other inmates. See Clay v. Miller, 626 F.2d 345, 347 (4th Cir. 1980); Pastorius v. Romer, No. 96–1126, 1996 WL 528359, at * 1 (10th Cir. Sept. 17, 1996) (upholding dismissal as frivolous of inmate's claim that he only received one hour of exercise per day, inadequate fresh air, and no direct exposure to sunlight); Caldwell v. Miller, 790 F.2d 589, 600–01 (7th Cir. 1986) (no violation where four weeks after lockdown prisoners were permitted one

hour of daily indoor exercise); see also Williams v. Branker, No. 5:09-CT-3139, 2011 WL 649845, at *2 (E.D.N.C. Feb. 10, 2011) (finding no Eighth Amendment violation where inmate was permitted to leave his cell for recreation for one hour five days per week) (citation omitted), aff'd, 462 F. App'x 348 (4th Cir. 2012); Hardy v. Bennett, No. 5:06-CT-3107-FL, 2008 WL 5640099, at *4 (E.D.N.C. Feb. 1, 2008) (finding similar recreational conditions at Polk constitutional), aff'd, 286 F. App'x 806 (4th Cir. 2008). Thus, plaintiff is unable to establish the objective prong of the Eighth Amendment test with respect to this claim.

Finally, even considering the HCON conditions as a whole, plaintiff is unable to satisfy the objective prong of the Eighth Amendment test because the conditions described by plaintiff do not violate contemporary standards of decency. See Beverati v. Smith, 120 F.3d 500, 503 (4th Cir. 1997); In re Long Term Admin. Segregation of Inmates Designated as Five Percenters v. Moore, 174 F.3d 464, 471-473 (4th Cir. 2003) (holding that "isolation inherent in administrative segregation or maximum custody is not itself constitutionally objectionable" and that "the restrictive nature of high-security incarceration does not alone constitute cruel and unusual punishment."); see also, Gallishaw v. Reed, No. 9:09-2566-CMC-BM, 2010 WL 2622931, at *9 (D.S.C. May 28, 2010) ("During the time period set forth in the complaint, Plaintiff was a prisoner in a state correctional facility, not a hotel. It should be expected that conditions in such a setting are oftentimes less than ideal.") (citations omitted), aff'd, 397 F. App'x 852 (4th Cir. 2010); Harris v. Fleming, 839 F.2d 1232, 1236 (7th Cir. 1988) ("Inmates cannot expect the amenities, conveniences and services of a good hotel."). Plaintiff further has not established that he suffered from any serious physical or mental injury as a result of his incarceration on HCON at Polk. Rather, plaintiff's medical records reflect that he regularly attributed his physical complaints, while on HCON, to past injuries

22

unrelated to the conditions on Polk. (Leach Aff. ¶ 33; Ex. A.) Plaintiff, additionally, has not established that he suffered from a significant mental or emotional injury on HCON. (Id.) Thus, plaintiff is unable to establish the objective prong of the Eighth Amendment test.

To the extent plaintiff asserts that defendants violated his constitutional rights because Polk did not utilize an available indoor "atrium" recreation area for HCON inmates, defendants are entitled to qualified immunity. As set forth above, the case law in effect when plaintiff was incarcerated at Polk indicated that the recreation conditions experienced by plaintiff were constitutional. See Hardy, 2008 WL 5640099, at *4. In accordance with this precedent and in light of the security risks present in this case, an objectively reasonable officer could have believed that the conditions were constitutional. Therefore, plaintiff also fails to establish the second prong of the qualified immunity analysis.

Even if plaintiff could satisfy the objective prong of the Eighth Amendment test with respect to his prison conditions, which the court maintains that he cannot, he is unable to establish an Eighth Amendment claim because he fails to satisfy the second prong of the Eighth Amendment test. Specifically, plaintiff has set forth no evidence to establish that any named defendant acted with wantonness with respect to his prison conditions. Moore, 174 F.3d at 472 ("Since the Five Percenters have failed to come forward with evidence from which it can be inferred that the defendant-officials were . . . knowingly and unreasonably disregarding an objectively intolerable risk of harm . . . summary judgment on this claim was likewise proper on the basis of the defendants' state of mind.") (internal quotation and citation omitted.) Thus, plaintiff failed to establish the subjective prong of the Eighth Amendment test, and there is no constitutional violation. Because plaintiff is unable to establish a constitutional violation, defendants are entitled to qualified

23

immunity for this claim. Based upon the foregoing, defendants' motion for summary judgment is GRANTED with respect to this claim, and plaintiff's motion for summary judgment is DENIED.

       3.       Fourteenth Amendment Due Process Claim

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In order to determine whether a due process violation has occurred, an initial determination must be made that a protected liberty interest exists and, if so, the next step is to define what process is mandated to protect it. See Sandin v. Conner, 515 U.S. 472, 484 (1995).

In order to demonstrate a liberty interest meriting procedural due process protections, an inmate must show "(1) denial of an interest that can arise either from the Constitution itself or from state laws or policies," and that (2) this denial imposed on him an atypical and significant hardship . . . in relation to the ordinary incidents of prison life." Prieto v. Clarke, 780 F.3d 245, 251 (4th Cir. 2015) (internal quotations omitted); Incumaa v. Stirling, 791 F.3d 517, 527 (4th Cir. 2015); Sandin, 515 U.S. at 484; see Wilkinson, 545 U.S. at 221-222. Here, the parties do not dispute that a procedure exists which creates a liberty interest in avoiding onerous or restrictive confinement standards. (Def.s' Mem. p. 23.) As a result, the court focuses its inquiry on whether the challenged conditions "present atypical and significant hardship in relation to the ordinary incidents of prison life." Incumaa, 791 F.3d at 527.

Recently, the Fourth Circuit Court of Appeals provided guidance in evaluating prison conditions in the context of the test set forth in Sandin. Incumaa, 791 F.3d at 527. Specifically, the court in Incumaa stated:

> Whether confinement conditions are atypical and substantially harsh "in relation to the ordinary incidents of prison life" is a "necessarily ... fact specific" comparative exercise. <u>Beverati v. Smith</u>, 120 F.3d 500, 502, 503 (4th Cir. 1997); <u>accord</u> <u>Ramirez v. Galaza</u>, 334 F.3d 850, 861 (9th Cir. 2003) ("There is no single standard for determining whether a prison hardship is atypical and significant, and the condition or combination of conditions or factors ... requires case by case, fact by fact consideration." (alteration in original) (internal quotation marks omitted)). In [<u>Prieto v. Clarke</u>, 780 F.3d 245, 249 (4th Cir. 2015)], we recognized that the <u>Sandin</u> standard contains two parts. <u>Cf.</u> <u>Prieto</u>, 780 F.3d at 253–54. First, we determine what the normative "baseline" is: what constitutes the "ordinary incidents of prison life" for this particular inmate? <u>Id.</u> at 253 ("What the inmates in <u>Beverati</u> could expect to experience and what <u>Prieto</u> can expect to experience differ significantly. . . . For conditions dictated by a prisoner's conviction and sentence are the conditions constituting the 'ordinary incidents of prison life' for that prisoner.") Then, with the baseline established, we determine whether the prison conditions impose atypical and substantial hardship in relation to that norm. <u>See id.</u> at 254 (holding that <u>Prieto</u>'s death row confinement did not impose atypical and significant hardship in relation to the ordinary incidents of prison life).

<u>Id.</u>

Here, plaintiff contends that his confinement at Polk for a period of 563 days[12] was atypical and substantially harsh in relation to the ordinary incidents of prison life. Plaintiff goes to great lengths to describe how the conditions of confinement on Polk's HCON unit were significantly different from the conditions experienced by regular population inmates at Bertie. Plaintiff, however, was housed on HCON at Polk, and not Bertie during the relevant time period. As for the conditions in general population at Polk, Ryan attests in his affidavit that the HCON unit at Polk "is, generally, substantially similar to the conditions throughout the rest of Polk []." (Ryan Aff. ¶ 12.)

---

[12] The duration of plaintiff's term at Polk was calculated using March 19, 2012, as the starting date, and October 3, 2013, as the termination date. (Pl.'s Aff. ¶¶ 29, 33.)

Plaintiff does not dispute this fact, and concedes that his prison conditions were substantially similar as he was promoted to MCON and ICON at Polk. (Pl.'s Aff. ¶¶ 42, 43.)

The fact that plaintiff was transferred from Bertie to Polk does not implicate any liberty interests because inmates do not have a protected liberty interest in avoiding transfer. See Cochran v. Morris, 73 F.3d 1310, 1318 (4th Cir. 1996) (en banc). Plaintiff, likewise, does not have a liberty interest in maintaining a particular security or custody classification level or in earning future good-time credits at a particular rate. See Baines v. Barlow, No. 7:10CV00535, 2010 WL 5477690, at *2-3 (W.D. Va. 2010) (concluding Virginia's law did not give rise to a liberty interest in maintaining or obtaining a particular security level); Saunders v. Webb, No. 7:08CV00293, 2008 WL 1904665, at *2-3 (W.D. Va. Apr. 29, 2008) (concluding change in security level does not pose an atypical and significant hardship under Sandin); Mills v. Holmes, 95 F. Supp. 3d. 924, 935 (E.D. Va. 2015) (observing that Virginia "[i]nmates have no protected liberty interest in remaining in or being assigned to a particular good conduct allowance level . . . ." (quoting West v. Angelone, No. 98-6858,1998 WL 746138, at *1 (4th Cir. Oct. 26, 1998)).

The court now turns to the specific conditions on the HCON unit at Polk. Courts which have considered prison conditions similar to those in the instant case, and found a liberty interest created by such conditions, have been faced with additional circumstances which are not present in the instant action. See Wilkinson, 545 U.S. at 224; Incumaa, 791 F.3d at 531. For instance, in Wilkinson, the United States Supreme Court considered a due process claim involving inmates confined at the Ohio State Penitentiary ("OSP"), a supermax security prison. Wilkinson, 545 U.S. at 223-24. The court acknowledged that the conditions at the Ohio supermax facility "likely would apply to most solitary confinement facilities[,]" but noted two additional components. Id. p. 211.

First, the OSP supermax inmates were assigned for "an indefinite period of time, limited only by [the] inmate's sentence." Id. Second, once assigned to supermax, "[i]nmates otherwise eligible for parole lo[st] their eligibility while incarcerated" at the facility. Id. at 215. Similarly, the Fourth Circuit Court of Appeals in Incumaa found a liberty interest in prison conditions experienced by a plaintiff housed for an indefinite period of time in solitary confinement which lasted for a period of 20 years. Incumaa, 791 F.3d at 531. The court in Incumaa determined that, like the plaintiff in Wilkinson, the plaintiff's confinement in solitary confinement was for an indefinite period of time. Id. The court in Incumaa further noted that the plaintiff's prison conditions were likely worse than those described in Wilkinson because the plaintiff in Incumaa was subjected to "a highly intrusive strip search every time he [left] his cell." (Id.)

Here, the conditions experienced by plaintiff were more analogous to those experienced by the plaintiff in Beverati than the plaintiff in Wilkinson or Incumaa. See Beverati, 120 F.3d at 503. Specifically, unlike the plaintiff in Incumaa, the plaintiff in this case was not subjected to the indefinite assignment to HCON, loss of parole eligibility, or the strip searches described in Incumaa. Rather, plaintiff's placement on HCON was for a limited period of time during which he received regular review of his custody classification and ultimately was promoted back to general population.

Finally, when analyzing conditions of confinement, a court must consider a correctional institution's need to maintain order, discipline, and control. See Sandin, 515 U.S. at 483-484 (stating that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment.") The rationale for such deference "is greatest when the maintenance of prison order is at stake." Moore, 174 F.3d at 469); see Wilkinson, 545 U.S. at 212 ("Courts must give substantial deference to prison management decisions before mandating

additional expenditures for elaborate procedural safeguards when correctional officials conclude that a prisoner has engaged in disruptive behavior."); <u>Florence</u>, 132 S. Ct. 1510 at 1515.

Here, plaintiff was transferred to administrative segregation after Bertie was placed on an emergency institutional lockdown in response to a series of orchestrated multi-institutional gang-related inmate-on-inmate attacks, two of which occurred at Bertie. (Partin Aff. ¶ 20; Clark Aff. ¶ 7.) Bertie engaged in a long-term lock down due to the threat to institutional safety of both staff and inmates as well as threatening the order and security of each facility involved. (Partin Aff. ¶ 22.) Accordingly, great deference is due prison officials with respect to inmate custody classification decisions due to the significant security interests DPS due to the coordinated gang-related activities in DPS facilities. Based upon the foregoing, plaintiff's conditions were not so atypical as to create a liberty interest meriting procedural due process protection.

Even if plaintiff could establish a liberty interest in procedural due process, which this court maintains that he cannot, he still is not entitled to relief because his custody classification proceedings satisfied procedural due process. The Fourth Circuit in <u>Incumaa</u>, instructs that in order to determine whether procedural due process protections are sufficient to protect an inmate's liberty interest, it is necessary to look to the three-part test set forth in <u>Mathews v. Eldridge</u>, 424 U.S. 319 (1976). Specifically, as stated in <u>Mathews</u> a court must balance the following three factors in determining whether procedural due process protections are adequate:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Id. at 334-335; see also, Wilkinson, 545 U.S. at 224 (applying these factors).

The court begins with the first Mathews factor–the private interest affected by the official action. Regarding this factor, the court in Wilkinson noted that an inmate's private liberty interest must be "evaluated . . . within the context of the prison system and its attendant curtailment of liberties" because "[p]risoners held in lawful confinement have their liberty curtailed by definition [and] the procedural protections to which the are entitled are more limited." Wilkinson, 545 U.S. at 225. Taking into consideration the Court's decision in Wilkinson, the Fourth Circuit in Incumaa found that an inmate confined to solitary confinement for a period of 20 years had a "a significant private interest in leaving the restrictive conditions." Incumaa, 791 F.3d at 534. While plaintiff's 563 day term of solitary confinement is much less than the term experienced by the plaintiff in Incumaa, plaintiff still retained a private interest in avoiding or leaving the restrictions of HCON.

The court now turns to the second factor–the risk of an erroneous placement under the procedures used, and the probable value, if any, of additional or substitute procedural safeguards. Procedural due process cases have consistently determined that notice and an opportunity to be heard are "among the most important procedural mechanisms for purposes of avoiding erroneous deprivations." See Wilkinson, 545 U.S. at 226 (citations omitted).

Plaintiff asserts that defendants violated his due process rights because they failed to comply with DPS policies requiring that an HCON referral to the DCC be accompanied by "details of the incident that makes high security control placement necessary[,]" and that the inmate "receive a written summary of the facts upon which the committee relied in making its determination" after the DCC hearing. (DPS Policies and Procedures, Chpt. C, §§ .1703(b), .1702(a)(4).) Plaintiff is correct that he never received a detailed written summary of the reasons supporting his referral and

29

continued placement on HCON. However, defendants' failure to follow this policy in this instance on its own does not constitute a constitutional violation. See Riccio v. County of Fairfax, Va., 907 F.2d 1459, 1469 (4th Cir. 1990) ("If state law grants more procedural rights than the Constitution would otherwise require, a state's failure to abide by that law is not a federal due process issue.").

Focusing on the specific circumstances of this case, the record reflects that plaintiff was provided regular notice of his custody classification recommendations, hearings, and decisions, as well as the ability to attend hearings regarding his classification every six months. (Partin Aff. Ex. B.)[13] Plaintiff's "Offender Control Action" narrative makes clear that plaintiff was provided the facts underlying his commitment to HCON at each hearing he attended, and was provided the opportunity to be heard. (Id.) This multi-tiered review and dual-hearing system substantially reduced the possibility of an erroneous deprivation. See Wilkinson, 545 U.S. at 225-226 (finding procedural due process satisfied where the inmate was provided notice of the factual basis leading to his consideration for supermax placement and a fair opportunity for rebuttal). Further, the differing recommendations of the committees at the various stages throughout plaintiff's classification process reflects that the committees did, in fact, provide meaningful review of plaintiff's custody classification and did not simply serve as a rubber stamp. Id. Accordingly, the risk of erroneous placement under these circumstances was minimal given the procedural protections in place.

Plaintiff also suggests that DPS should have provided inmates the opportunity to call witnesses during custody classification hearings. The Court in Wilkinson addressed this issue. Wilkinson, 545 U.S. at 228. Specifically, the Court concluded that the value of the right to call

---

[13] DPS policy only requires a DCC hearing for HCON security classification procedures. See DPS Policies and Procedures, Chpt. C, § .1702.

witnesses was "doubtful in comparison to" the danger such right posed. Id. ("Were Ohio to allow an inmate to call witnesses or provide other attributes of an adversary hearing before ordering transfer to OSP, both the State's immediate objective of controlling the prisoner and its greater objective of controlling the prison could be defeated."). The Court in Wilkinson, instead, encouraged courts to consult the "informal, nonadversary procedures" set forth in Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1 (1979), and Hewitt v. Helms, 459 U.S. 460, 476 (1983).[14] Id. Here, plaintiff was provided such procedural protections. See Hewitt, 459 U.S. at 476 ("An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decision maker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied.").

Finally, the court considers the third Mathews factor–the state's interest. Given that DPS policy already contains policies addressing written notice of custody classification decisions, the court declines to evaluate the value of the implementation of any such procedure. As for the ability to call witnesses, given the security concerns which accompany HCON custody classification, such a procedure would be unnecessary given the procedural protections afforded. See Wilkinson, 545 U.S. at 227 ("Prison security, imperiled by the brutal reality of prison gangs, provides the backdrop

_____

[14] "Although Sandin abrogated Greenholtz's and Hewitt's methodology for establishing the liberty interest, these cases remain instructive for their discussion of the appropriate level of procedural safeguards." Wilkinson, 545 U.S. at 229.

of the State's interest. Clandestine, organized, fueled by race-based hostility, and committed to fear and violence as a means of disciplining their own members and their rivals, gangs seek nothing less than to control prison life and to extend their power outside prison walls.").

After evaluating all three Mathews factors, the court finds that DPS's policies and procedures governing the classification and review of HCON inmates were adequate to safeguard an inmate's private interest in not being assigned to HCON. Specifically, plaintiff was provided notice and an opportunity to be heard regarding each of his custody classification decisions. Plaintiff, additionally, was provided notice of the factual basis for his custody classification at each hearing he chose to attend. (See Partin Ex. B.) Finally, plaintiff was provided meaningful reviews of his custody classification as evidenced by his custody class promotions and, at times, disagreement of prison officials at the various levels of review. (Id.)

Based upon the foregoing, the court finds that the procedures at issue did not violate plaintiff's due process rights. To the extent plaintiff's expert Aiken disagrees with prison officials' custody classification decisions for plaintiff, such disagreement does not detract from the fact that plaintiff received adequate due process procedural protections in this action. (See Aiken Report p. 6.) Thus, plaintiff failed to establish a constitutional violation and defendants are entitled to qualified immunity. Because the court has determined that defendants are entitled to qualified immunity, defendants' motion for summary judgment must be granted, and plaintiff's motion for summary judgment must be denied.

**CONCLUSION**

For the foregoing reasons, plaintiff's requests for injunctive relief are DISMISSED AS MOOT, plaintiff's motion for summary judgment (DE 65) is DENIED, and defendants' motion for summary judgment (DE 71) is GRANTED. The clerk of court is DIRECTED to close this case.

SO ORDERED, this the 21st day of March, 2016.

LOUISE W. FLANAGAN
United States District Judge